IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHARLOTTE A. PERRY,            )
              Plaintiff,       )
                               )
        v.                     )       Civil Action No. 05-0109
                               )
JO ANNE B. BARNHART,           )       Judge Cercone
COMMISSIONER, SOCIAL SECURITY  )       Magistrate Judge Hay
ADMINISTRATION,                )
                               )
              Defendant.       )


REPORT AND RECOMMENDATION

RECOMMENDATION

        It is respectfully submitted that the Motion for
Summary Judgment filed by Plaintiff [dkt. no. 7] be denied.  It
is further recommended that the Motion for Summary Judgment filed
by the Defendant [dkt. no. 9] be granted and that the decision of
the Commissioner denying Plaintiff's application for disability
insurance benefits and supplemental security income be affirmed.

REPORT

        **Procedural History**

        Charlotte A. Perry brought this action pursuant to 42
U.S.C. § 405(g) for judicial review of the final decision of the
Commissioner of Social Security ("Commissioner") denying her
claims for disability insurance benefits ("DIB") under title II
of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-433, and
for Supplemental Security Income ("SSI") under title XVI of the
Act, 42 U.S.C. §§ 1381-1383f.

In her application filed August 11, 2004, Ms. Perry alleges that she has been disabled since December 12, 2002, due to fibromyalgia, chronic fatigue, herniated disk, depression, numbness in extremities, pain and weakness in arms. (Tr. 118, 140). The state agency denied her applications on October 14, 2003 (Tr. 103-107). Thereafter, Ms. Perry requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 108).

The case was heard before an ALJ on May 5, 2004, in Morgantown, West Virginia (Tr. 34-102). Ms. Perry, who was represented by counsel, and a vocational expert, James E. Ganoe, testified at this hearing (Tr. 15, 34-102). The ALJ concluded in a decision dated September 8, 2004, that Ms. Perry retained the ability to perform light work activity, with certain specified limitations, that exists in significant numbers in the national economy (Tr. 25-26).

Ms. Perry requested review of the ALJ's decision by the Appeals Council (Tr. 11). With this request, Ms. Perry submitted additional evidence to the Appeals Council that had not been submitted to the ALJ (Tr. 9). Specifically, she submitted a September 14, 2004 Uniontown Hospital radiology report and a November 8, 2004 brief from claimant's representative (Tr. 395-400). The Appeals Council determined to make the additional evidence part of the administrative record and denied review of the ALJ's decision on the merits (Tr. 6-9). The decision of the

ALJ thus became the Commissioner's final decision for purposes of this judicial review.

### Factual Background

Ms. Perry was born on November 26, 1953, and was fifty years old at the time of the ALJ's decision (Tr. 16, 118). Ms. Perry completed twelve grades of formal schooling and completed one college accounting course (Tr. 16). Her past work experience includes employment as a payroll clerk, a fiscal assistant, and an accounts payable clerk (Tr. 141). She alleges she has been unable to work since December 12, 2002 (Tr. 118), due to orthopedic problems, fibromyalgia and depression (Tr. 140). After the alleged onset of disability, Ms. Perry worked as an accounts payable clerk for approximately two months (Tr. 40). She left that work on June 23, 2003, due to her medical condition, and has not worked since that time (Tr. 40-41). Ms. Perry did not participate in the Ticket Program or another program of vocational rehabilitation services, employment services or other support services to help her return to work (Tr. 146, 167).

### Medical History[1]

It appears that in December 2001, Owen Nelson, M.D., performed surgery on Ms. Perry's right hand for carpal tunnel

---

[1]   Because Ms. Perry's medical history is not in dispute, much of the recitation here is excerpted from the comprehensive summary set forth in the Commissioner's brief.

3

syndrome (CTS) (Tr. 210-11).  The next medical treatment of
record is Ms. Perry's presentment to the emergency room (ER) at
Uniontown Hospital on February 18, 2002, for treatment for
symptoms resulting from a cold (Tr. 232) and for complaints of
back pain (Tr. 232-43).  She was treated conservatively and
released (Tr. 236).

Next, in November 2002, May Flores, M.D., Ms. Perry's
primary physician, referred Ms. Perry to David Seaman, M.D., a
rheumatologist, for an arthritis consultation (Tr. 244) to
evaluate her complaints of "joint pain, muscle pain and weakness
and extreme fatigue" (Tr. 245).  Dr. Seaman noted Ms. Perry's
report of multiple muscle tender points; her physical exam by Dr.
Seaman was unremarkable.  Id.  Dr. Seaman diagnosed possible
early mild osteoarthritis affecting the knees and low back,
fibromyalgia, and possible peripheral neuropathy.  Id.  He also
noted a history of depression.  Id.  Dr. Seaman concluded there
was no "objective evidence" to support an inference that Ms.
Perry was totally or permanently disabled from a rheumatological
standpoint (Tr. 246).  He referred Ms. Perry for physical therapy
(PT), including ultrasound, moist heat, whirlpool, massage,
electrical stimulation, and water exercises (Tr. 247).  Ms. Perry
participated in PT from November 2002 until December 2002 and
reported minimal improvement (Tr. 252).

Dr. Seaman also sent Ms. Perry for an EMG/nerve
conduction study (Tr. 246, 248-49), to determine whether she had

4

peripheral neuropathy (Tr. 246).  The study was conducted in December 2002.  It was consistent with "moderate" L4-L5 radiculopathy, with greater involvement in her right lower extremity (Tr. 249).  Therefore, Dr. Seaman referred Ms. Perry for an MRI of her lumbar spine in January 2003 (Tr. 250-51).  The MRI suggested Ms. Perry had a small (Tr. 253) L5-S1 herniated disc resulting in spinal stenosis and encroachment upon her left neural foramen (Tr. 250).  There was no abnormality on her right (Tr. 253) and no signs of a disc herniation at her L4-L5 level (Tr. 250).

In February 2003, Dr. Seaman referred Ms. Perry to Dr. Whiting for further evaluation of her complaint of numbness and tingling in her feet (Tr. 252-53).  Ms. Perry denied having any lumbar spine or radicular-type pain or lower extremity weakness.  On exam, she exhibited good range of motion (ROM) of her lumbar spine.  There were no lumbar paravertebral muscle spasms or tenderness.  She had no focal motor weakness or atrophy.  Her pinprick and light touch sensation (Tr. 252) and reflexes (Tr. 252-53) were intact.  Her straight leg raising (SLR) test was unremarkable.  Dr. Whiting concluded that Ms. Perry's complained-of paresthesia did not clearly seem to be radicular in nature and was unlikely related to her L5-S1 herniated disc.  Dr. Whiting suggested Ms. Perry may have "early" neuropathy, so he referred her for a selective left S1 root block injection (Tr. 253), which was done later that year (Tr. 305).

Ms. Perry returned for a follow-up evaluation with Dr. Seaman in March 2003.  Dr. Seaman reported Ms. Perry's neurologic exam was unchanged and she exhibited no signs of active synovitis (Tr. 254).

In April 2003, Ms. Perry presented to Dr. Owen for an orthopedic evaluation.  Ms. Perry told Dr. Owen that she had received "excellent" functional recovery of her right hand (Tr. 256, 283) since he performed CTS surgery on her in December 2001 (Tr. 210-11).  She explained her right hand felt "quite normal" and it did not interfere with her activities of daily living (ADL).  However, she complained of increasing symptoms with her left hand.  Dr. Owen noted her prior electrodiagnostic test results suggested she had an abnormality in the conduction of her left median nerve.  Accordingly, Dr. Owen scheduled Ms. Perry for CTS release surgery (Tr. 283), which he performed in May 2003 (Tr. 262-64).  Dr. Owen reported Ms. Perry did "quite well" post-operatively (Tr. 255-56).  Ms. Perry used her left hand with "very little" discomfort and there was no numbness or tingling over her medial nerve distribution (Tr. 256).

In August 2003, Ms. Perry saw Dr. Flores for a regular check-up (Tr. 286-87).  At that time, Ms. Perry asked Dr. Flores for a disability opinion (Tr. 287), but Dr. Flores advised Ms. Perry to seek that opinion from one of the specialists with whom she treated (Tr. 286).  There is no disability opinion in the administrative record from any of these specialists.

In September 2003, Shobha Asthana, M.D., a neurologist, performed a neurologic evaluation of Ms. Perry to further investigate her complaint of paresthesia involving her feet (Tr. 332-34). Ms. Perry also complained she dropped objects with her hands. (Tr. 332). Ms. Perry did not report any change in the coloration of her feet. Id. She denied having a history of arthritis, joint pain, aches, or loss of strength. Id. She complained of neck spasms. Id. She was alert and oriented (Tr. 333). Her cranial nerves were grossly intact. Id. Her neck was symmetric and supple, with no evidence of lymphadenopathy or thyromegaly. Id. She exhibited no edema, ulceration, tenderness, varicosities, erythema, or deformity of her extremities. Id. She displayed full range of motion of her lumbar spine and normal cervical and thoracic range of motion. Id. There were no deficits of the strength, tone, or bulk in her upper and lower extremities (Tr. 333). She walked on her toes and heels and tandem walked without difficulty (Tr. 334). Her reflexes were equal and well-preserved (Tr. 333). Her sensory exam was notable only for her "subjective complaints" of tingling in her feet (Tr. 334). She exhibited no involuntary movements. Her straight leg raising (SLR) test was negative (Tr. 333). Dr. Asthana referred Ms. Perry for an MRI of her cervical spine to see whether she had radiculopathy (Tr. 334). The September 2003 MRI of Ms. Perry's cervical spine revealed "mild" degenerative of her C5-C6 disc, but no evidence of a herniation (Tr. 335).

After the Agency denied Ms. Perry's DIB (Tr. 104-07) and SSI (Tr. 391-94) claims, Ms. Perry referred herself to Emira Zubchevich, M.D., for a psychiatric evaluation in October 2003 (Tr. 326-30).  Dr. Zubchevich's records reflect that Ms. Perry complained of a 10-year history of depression and panic attacks while driving, or shopping alone (Tr. 327).  She said she felt "good" (Tr. 327) when she shopped with her sister, though, and that her marriage was "OK" (Tr. 327-329).  Ms. Perry appeared neatly dressed and groomed.  (Tr. 328).  Her facial expression was tense (Tr. 328) and she cried about her condition (Tr. 328-29).  She was oriented in all spheres (Tr. 329).  She was of average intelligence.  Id.  Her speech was clear and coherent. Id.  Her affect was somewhat incongruent and her mood was dysphoric.  Id.  She complained of being sad and in a low mood "practically all the time" (Tr. 327).  Her associations were adequate, concrete, well-elaborated, and goal directed (Tr. 329). Her abstract thinking was rather poor and she exhibited difficulty doing serial 7 subtractions.  Id.  Her remote memory was fair, her recent past memory was good and her recent memory was "somewhat" impaired.  Id.  Her immediate retention and recall demonstrated some difficulty.  Id.  Her impulse control was "Fairly good" (Tr. 329).  She claimed to be withdrawn socially (Tr. 330).

Dr. Zubchevich's diagnostic impression included major depression and dependent personality (Tr. 330).  He rated Ms.

8

Perry's global assessment of functioning (GAF) at 50 (Tr. 330, 336).[2]  Dr. Zubchevich modified Ms. Perry's medication regimen (Tr. 330).  He opined that Ms. Perry suffered the following functional limitations: (1) "poor" adaptive behavior; (2) "Marked" restrictions in her activities of daily living; (3) "Marked" difficulties in maintaining social functioning; and (4) "Frequent" difficulties with concentration, persistence or pace resulting in failure to complete tasks in a timely manner (Tr. 337).

The record contains an "Assessment of Ability to do Work-Related Activities (Mental)" questionnaire, which suggests Ms. Perry had a "Seriously Limited" ability to make occupational adjustments, understand, remember and carry out complex or detailed job instructions, behave in an emotionally stable

---

[2]  A global assessment of functioning ("GAF") score is used to report an individual's overall level of functioning with respect to psychological, social, and occupational functioning. The GAF scale is divided into ten ranges of functioning. A GAF rating is within a particular decile if either the symptoms severity or the level of functioning falls within the range. A GAF score of between 41 and 50 indicates:

> **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **or any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job).

Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV™") pp. 32-34 (American Psychiatric Association, Task Force on DSM-IV (4th ed. (Text Revised) 2000) (emphasis in original).

manner, and relate predictably in social situations (Tr. 338-339).

In November 2003, Ms. Perry again brought up the issue of obtaining a disability opinion from Dr. Flores.  Ms. Perry had apparently discussed the issue with Dr. Seaman but did not "like" what Dr. Seaman said in his evaluation (Tr. 363).[3]  Dr. Flores did not complete the medical "disability form" (Tr. 206-305, 319-56, 360-64, 366-72, 374-82) which Ms. Perry asked her to complete in November 2003 (Tr. 363).

Later in November 2003, Ms. Perry's attorney referred Ms. Perry to Ajay K. Mathur, M.D., for an evaluation (Tr. 322-25).  Dr. Mathur's findings included lumbar spondylosis, fibromyalgia with an "inability to cope with pain," and depression (Tr. 324).  Dr. Mathur advised the determination of whether Ms. Perry was disabled was dependent on the results of a physical capacity evaluation and, thus, he referred her to "Dr. Vrablek" for a physical capacity evaluation (Tr. 325).  The administrative record does not contain any report of the results of her physical capacity evaluation with Dr. Vrablek.

Later in November 2003, Fred Edge, M.D., a pain management specialist, evaluated Ms. Perry (Tr. 340-46).  Ms. Perry complained she had difficulty with fibromyalgia and chronic fatigue (Tr. 345), but she said her neck and back felt "good"

---

[3]     It does not appear that Ms. Perry submitted Dr. Seaman's evaluation to the ALJ for consideration.

(Tr. 342).  Ms. Perry's motor, sensory, and reflex exams were
intact (Tr. 346).  X-rays suggested she had degenerative changes
of her elbows (Tr. 352), lumbar spine (Tr. 355) and right knee
(Tr. 353).

In December 2003, Dr. Asthana provided Dr. Flores with
an update on Ms. Perry's most recent neurologic exam.
Dr. Asthana reported Ms. Perry continued to complain of
generalized arthralgia and myalgia.  However, her neurologic exam
was "Stable" (Tr. 360)  The MRI of her brain (Tr. 361) was also
negative except for "mild" ethmoid sinusitis (Tr. 360).

In May 2004, Dr. Zubchevich completed an "Assessment of
Ability to Do Work-Related Activities (Mental)" questionnaire,
noting that Ms. Perry had a "Seriously Limited" ability to make
occupational adjustments and relate predictably in social
situations (Tr. 374-75) and a "Poor/None" ability to make
performance adjustments (Tr. 375).  Consistent with the doctor's
previous assessment (Tr. 337), Dr. Zubchevich reiterated that Ms.
Perry's condition caused a "Marked" difficulty in her activities
of daily living and social functioning with "Frequent" episodes
of deficiencies in her concentration, persistence or pace (Tr.
337, 378).

### Hearing Testimony and ALJ Decision

Ms. Perry acknowledged that none of her physicians had
placed any restrictions upon her activities (Tr. 70).  She
indicated, however, the following impairments prevent her from

11

working: arthritis, fibromyalgia, chronic fatigue, major
depression, short term memory loss, and neck muscle spasms (Tr.
67).  More of her testimony is detailed in the "Discussion"
section, infra.

James Ganoe, an impartial vocational expert (VE),
provided expert testimony on the vocational aspects of Ms.
Perry's case at the administrative hearing (Tr. 91-100).  The ALJ
asked the VE whether there were jobs available in the national
economy for a hypothetical individual who: (1) was Ms. Perry's
age and had her education and vocational profile; (2) needed the
opportunity to sit or stand in the course of the workday;
(3) could do light work; (4) could not crouch, crawl or kneel,
but could do other postural activities occasionally; and (5)
could only bend to the degree necessary to touch her knees.  The
VE advised the aforementioned individual could perform a
significant number of jobs in the national economy within such
occupations as house sitter (90,000 jobs), ticket seller (219,000
jobs), and watch guard gatekeeper (111,000 jobs) (Tr. 94).  The
VE explained these jobs involved doing unskilled, routine,
repetitive work (Tr. 95).  Additionally, the ALJ limited Ms.
Perry to working with things rather than with people and
restricted her to occasional interaction with supervisors and
co-workers and no interaction with the public (Tr. 98-99), to
which the VE reported that such a hypothetical individual could
still perform the house sitter jobs identified as well as do work

12

as, for example, a price marker (115,000 jobs) and hand packer (196,100 jobs) (Tr. 99).

        The ALJ determined that Ms. Perry had the residual functional capacity to perform light work with certain limitations or accommodations (Tr. 27).  Accordingly, the ALJ found that Ms. Perry was not under a "disability" as defined by the Social Security Act (Tr. 27).

### Standard of Review

        In reviewing the administrative determination by the Commissioner, the question before the court is whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Substantial evidence is defined as less than a preponderance and more than a mere scintilla.  Perales, 402 U.S. at 402.  If supported by substantial evidence, the Commissioner's decision must be affirmed.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

        A five-step process is used to determine disability eligibility, see 20 C.F.R. § 404.1520, but in this case only step

five is in dispute.[4]  At the fifth step, the Commissioner bears
the burden of proving that, considering the claimant's residual
functional capacity,[5] age, education, and past work experience,
she can perform work that exists in significant numbers in the
regional or national economy.  42 U.S.C. § 423(d)(2)(A); see also
Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); Sykes v. Apfel,
228 F.3d 259, 263 (3d Cir. 2000).

**Discussion**

Ms. Perry argues that the ALJ's decision is not
supported by substantial evidence.  In particular, Ms. Perry
claims that (1) the ALJ improperly rejected the treating
psychiatrist's assessment, and (2) the ALJ's determination that
Ms. Perry's statements regarding her impairments and their impact
on her ability to work were not entirely credible was error.

We turn first to Ms. Perry's argument concerning her
mental condition.  As previously noted, Ms. Perry's treating
psychiatrist, Dr. Emira Zubchevich, completed two assessments of
Ms. Perry's ability to do work-related activities.  The first was
completed within one month of Ms. Perry beginning her treatment

---

[4]  The five-step sequential evaluation process for disability claims
requires the Commissioner to consider whether a claimant: (1) is
working, (2) has a severe impairment, (3) has an impairment that
meets or equals the requirements of a listed impairment, (4) can
return to her past relevant work, and (5) if not, whether she can
perform any other work in the national economy.  20 C.F.R. §§
404.1520, 416.920.

[5]  A claimant's "residual functional capacity" is what she can
do despite the limitations caused by her impairments.
Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001).

14

with Dr. Zubchevich, and the second was done approximately six months thereafter.  Dr. Zubchevich concluded that Ms. Perry had poor or no ability to adjust to a job, given her limitations in her ability to follow work rules, use judgment, relate to co-workers, deal with the public and/or supervisors, function independently, maintain concentration and relate predictably in social situations (Tr. 338-339; 374-375).  Ms. Perry asserts that the ALJ improperly "dismissed ... with one sentence"[6] the opinion of

Dr. Zubchevich.

The regulations instruct adjudicators to rate the degree of a claimant's functional limitations based on the extent to which the impairments interfere with her ability to function in four broad functional areas.  20 C.F.R. §§ 404.1520a(c)(2)-(3), 416.920a(c)(2)-(3) (2004).  These areas are: activities of daily living (ADL); social functioning; concentration, persistence or pace; and episodes of decompensation.  20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).  In the instant case, the ALJ carefully assessed each of these areas and determined that Ms. Perry's condition caused a mild restriction in her ADL, a moderate restriction in her social functioning, a mild

---

[6]   Ms. Perry refers to the following finding by the ALJ: "The undersigned has noted Dr. Zubchevich's assessment expressed in the questionnaire and finds that Dr. Zubchevich's initial assessment and follow-up treatment notes do not support his findings and is not given controlling weight or special significance."  Tr. 20.

restriction in her concentration, persistence, or pace, and no repeated episodes of decompensation (Tr. 18).

The evidence of record concerning Ms. Perry's ADL supports the ALJ's determination that she is only mildly restricted in this category. She admitted that she is able to take care of her personal needs without assistance (Tr. 48, 182).[7] She indicated that it was easier for her to stand than sit and that she could comfortably stand in 30 to 60 minute intervals and could only sit in about 15-minute intervals (Tr. 68, 179). She could walk approximately one-quarter of a mile in 15-minute intervals on level ground without stopping (Tr. 69). The ALJ accommodated Ms. Perry's self-professed limitations by limiting her to work with a sit/stand option (Tr. 24).

As well, Ms. Perry acknowledged she could comfortably bend and touch her knees (Tr. 71), which indicated she could do work where her bending was limited to the degree necessary to touch her knees (Tr. 24). Here, too, the ALJ accommodated her limitation (Tr. 24).

Ms. Perry appears to have no residual limitations following her CTS surgeries. She can dial a regular touch tone telephone, use a standard size TV remote control, knife and fork, tie shoes, and fasten closures on clothing (Tr. 180), which suggests she had no significant problem using her hands.

---

[7]     We note that Dr. Zubchevich remarked that Ms. Perry appeared neatly dressed and groomed (Tr. 328).

16

Ms. Perry lives with and cares for her husband and children (Tr. 23-24).  She makes independent decisions (Tr. 182). She takes care of the family's finances (Tr. 57, 59), including banking on-line (Tr. 59-60).  She cooks (Tr. 49), does some housecleaning, does the laundry (Tr. 179), and sweeps the porch (Tr. 64).  She tends to her flower garden (Tr. 56-57, 64).  She grocery shops (Tr. 52-53) and runs errands (Tr. 53) such as picking-up the mail from the post office (Tr. 63).  She enjoys recreational activities such as watching television (Tr. 55) and reading magazines (Tr. 55).  She also reads to her daughter and helps her daughter with her homework (Tr. 187).  She regularly talks to her sister on the telephone (Tr. 58).  She attends her daughter's softball games, both at home and away (Tr. 54) and shops with her children (Tr. 181).  She goes to the movies "every now and then" with her children (Tr. 64).  She attends church every other week (Tr. 62).  She enjoys swimming (Tr. 60) and usually swims everyday when the pool is open (Tr. 61).  In our view, the ALJ correctly noted that the ability to engage in these activities is inconsistent with an allegation of total disability (Tr. 24).  In sum, the evidence supports the ALJ's determination that Ms. Perry is only mildly restricted in the area of ADL.

The ALJ also determined that Ms. Perry's impairments caused a moderate restriction in her social functioning (Tr. 18). Social functioning refers to the capacity to interact independently, appropriately, effectively, and on a sustained

basis with other individuals.  20 C.F.R. pt. 404, subpt. P, app.
1, § 12.00C2 (2004).  Here, Ms. Perry stated she got along "Good"
with people in authority and generally responded "OK" to
criticism unless it involved her physical limitations, which
criticism would cause her to cry (Tr. 181).  Outside of the
"burden" she felt her condition imposed on her husband, Ms. Perry
apparently had no difficulty getting along with family, friends,
neighbors, and others (Tr. 181).  Clinically, her speech was
clear and congruent (Tr. 329).  Difficulties in social
functioning may be demonstrated by, for example, a history of
altercations, firings, evictions, fear of strangers, or social
isolation.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C2
(2004).  Ms. Perry did not have a history of altercations or
evictions (Tr. 181-82) and her impulse control was assessed as
"Fairly good" (Tr. 329).  Although she mentioned one instance
where she had difficulty getting along with a supervisor when she
worked (Tr. 183), there is no evidence she was ever fired as a
result.  She indicated that she was fired only once, due to
absenteeism in order to attend her medical appointments
(Tr. 140).  Thus, to the extent it could be said there is a
"history" of firing, it appears to be unrelated to Ms. Perry's
social functioning.

        The evidence indicates that Ms. Perry was not afraid of
strangers or socially isolated.  She grocery shopped (Tr. 52-53),
went shopping with her sister (Tr. 327, 329) and children (Tr.

181), went to the movies with her children (Tr. 6-65, 181), went
to her daughter's softball games (Tr. 54), ran errands (Tr. 53,
63), and attended church (Tr. 62).  The evidence supports the
ALJ's determination that Ms. Perry is moderately restricted in
her ability to function socially.  Moreover, given her complaints
of difficulty getting along with a supervisor (Tr. 183) and
difficulty going out in public alone (Tr. 181), the ALJ
accommodated Ms. Perry by limiting her to working with things and
not with people and by requiring only occasional interaction with
supervisors and co-workers, and no interaction with the public
(Tr. 24).

The ALJ determined that Ms. Perry's impairments caused
a mild restriction in her concentration, persistence or pace (Tr.
18).  "Concentration, persistence or pace" refers to the ability
to sustain focused attention and concentration sufficiently long
to permit the timely and appropriate completion of tasks commonly
found in work settings.  20 C.F.R. pt. 404, subpt. P, app. 1,
§ 12.00C3 (2004).  Ms. Perry exhibited some clinical difficulty
in her concentration (Tr. 329), which the ALJ accommodated when
she limited Ms. Perry to unskilled, routine, repetitive work (Tr.
95).  Otherwise, Ms. Perry's associations were adequate,
concrete, well elaborated, and goal directed (Tr. 329).  On tests
of her immediate retention and recall, she could repeat 5 digits
forward and 4 in reverse (Tr. 329).  Ms. Perry regularly engaged
in activities which required concentration and attention, such as

19

taking care of her family's finances (Tr. 57, 59), banking on-line (Tr. 59-60), watching television (Tr. 55-56), reading magazines (Tr. 55), helping her daughter with her homework (Tr. 187), and cooking (Tr. 49).  Thus, the ALJ reasonably concluded that Ms. Perry retained sufficient concentration, persistence or pace capability to engage in routine, repetitive type work (Tr. 18, 95).

There is no evidence that Ms. Perry's condition resulted in repeated episodes of decompensation (Tr. 18). Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing ADL or maintaining social relationships or concentration, persistence or pace.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C4 (2004). The ALJ considered (Tr. 24) that Ms. Perry admitted improvement in her mood with medication (Tr. 82, 369) and that her medical records noted it generally "controlled" her "anxiety/depression" (Tr. 288).  The ALJ took into account (Tr. 24) that Ms. Perry did not seek mental health treatment until October 2003 (Tr. 326-30), the same month the Agency denied her DIB (Tr. 104-07) and SSI (Tr. 391-94) claims.  As well, the record reflects that Ms. Perry is not undergoing intensive treatment, but, rather, sees Dr. Zubchevich only once or twice monthly (Tr. 43). Additionally, Ms. Perry admitted she had no difficulty responding to changes (Tr. 182).

Episodes of decompensation may be inferred from medical records documenting the need for a more structured psychological support system, such as hospitalization or placement in a halfway house or a highly structured and directing household. Id.  The record here reflects no such need.

There is substantial evidence in the record to support the ALJ's determination that Ms. Perry retained the mental RFC to engage in a wide-range of unskilled type work with moderate social restrictions.  Dr. Zubchevich's opinion on Ms. Perry's RFC (Tr. 374-76) does not alter this determination.  Dr. Zubchevich opined that Ms. Perry had a "Seriously Limited" ability to make occupational adjustments and relate predictably in social situations and a "Poor/None" ability to make performance adjustments (Tr. 374-75).  It appears that the ALJ considered all medical opinions offered concerning the nature and severity of Ms. Perry's impairments and their resulting limitations, including Dr. Zubchevich's opinion, pursuant to the criteria set forth in 20 C.F.R. §§ 404.1527, 416.927 (2004) (Tr. 19). See generally Ward v. Chater, 924 F. Supp. 53, 56 (W.D. Va. 1996) (holding the regulations are the authoritative standard for evaluating treating medical source opinions).

The issue of Ms. Perry's RFC is reserved to the Commissioner.  Therefore, the ALJ was not required to give any special significance to Dr. Zubchevich on this issue.  See 20 C.F.R. §§ 404.1527(e)(2)-(3), 416.927(e)(2)-(3).  Otherwise, a

21

treating medical source's opinion is given controlling weight only when it is "well-supported" by "medically acceptable clinical and laboratory diagnostic techniques" and it is "not inconsistent" with the other "substantial evidence" in the case. Id., at §§ 404.1527(d)(2)-(4), 416.927(d)(2)-(4). Given this criteria, the ALJ determined Dr. Zubchevich's opinion was not entitled to "controlling weight" or "special significance" because it was unsupported by the treatment notes (Tr. 20).

Nor was Dr. Zubchevich's opinion consistent with the record as a whole. As the Commissioner points out, there are several illustrations which demonstrate this point. Dr. Zubchevich opined that Ms. Perry's condition resulted in a "Seriously Limited" restriction in her social functioning, e.g., in her ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors (Tr. 374), and relate predictably in social situations (Tr. 375). However, Dr. Zubchevich found Ms. Perry exhibited "Fairly good" impulse control (Tr. 329). Moreover, Dr. Zubchevich's "Seriously Limited" opinion appears to be inconsistent with other substantial evidence in the case, e.g., Ms. Perry did not have a history of altercations (Tr. 181-82). She admitted she had no difficulty getting along with family, friends, neighbors, that she got along "Good" with people in authority, and that she generally responded "OK" to criticism (Tr. 181). The evidence supports the conclusion that, contrary to Dr. Zubchevich's

22

opinion, Ms. Perry could engage in work which involved primarily working with things and not people, only occasional interaction with supervisors and co-workers, and no interaction with the public (Tr. 24).

As another example, Dr. Zubchevich opined that Ms. Perry had a "Seriously Limited" ability to maintain attention/concentration (Tr. 374) and understand, remember, and carry out simple job instructions (Tr. 375). Interestingly, Dr. Zubchevich also found Ms. Perry's thought processes were adequate, concrete, well-elaborated and goal directed (Tr. 329). As noted, Ms. Perry regularly engaged in activities which required concentration and attention, such as taking care of her family's finances (Tr. 57, 59), banking on-line (Tr. 59-60), and helping her daughter with her homework (Tr. 187). Taken together, there is substantial evidence to support the ALJ's determination that Ms. Perry retained sufficient attention/concentration ability to engage in routine, repetitive type work (Tr. 95).

As yet a third example, Dr. Zubchevich opined that Ms. Perry had a "Seriously Limited" ability to use judgment and function independently (Tr. 374). However, Ms. Perry indicated that she could independently make decisions and she handled the family's finances, which suggests she retained some ability to use judgment and function independently.

For the above-noted reasons, the ALJ properly determined that Dr. Zubchevich's opinion was not entitled to "controlling weight" or "special significance" under § 404.1527(d)(2)-(4) and § 416.927(d)(2)-(4)(Tr. 20).

Ms. Perry points to Dr. Zubchevich's GAF assessment of 50 as an indication of the severity of her limitations in the work setting.  As the Commissioner noted in her brief, GAF ratings do not have a direct correlation to the severity requirements in Appendix 1, 65 Fed. Reg. 50746, 50765-65 (2000). Nevertheless, it appears that by limiting Ms. Perry to unskilled, routine, repetitive work (Tr. 95) which primarily involved working with things and not with people and involved only occasional interaction with supervisors and co-workers and no interaction with the public, the ALJ considered Dr. Zubchevich's GAF rating (Tr. 24).

Ms. Perry also argues that it was error to find her statements regarding her impairments and their impact on her ability to work were not entirely credible.  It appears, however, that the ALJ considered all of Ms. Perry's symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. §§ 404.1529, 416.929 (2004) (Tr. 19).  See generally Hartranft v. Apfel, 181 F.3d at 362 (utilizing the regulations in the evaluation of subjective symptoms).  Cf. Craig v. Chater, 76 F.3d 585, 593 (4th Cir. 1996)

24

(holding the regulations are the authoritative standard for
evaluating subjective complaints).  The ALJ did not dispute Ms.
Perry's impairments were reasonably expected to cause some of the
subjective complaints she complained of (Tr. 19-24).

> Once an ALJ concludes that a medical impairment
> that could reasonably cause the alleged symptoms
> exists, he or she must evaluate the intensity and
> persistence of the pain or symptoms, and the
> extent to which it affects the individual's
> ability to work.  This obviously requires the ALJ
> to determine the extent to which a claimant is
> accurately stating the degree of pain or the
> extent to which he or she is disabled by it.

Hartranft, 181 F.3d at 362.  Overall, allegations of subjective
symptoms must be supported by objective medical evidence.  Id.
Objective medical evidence is evidence obtained from the
application of medically acceptable clinical and laboratory
diagnostic techniques, such as evidence of reduced joint motion,
sensory deficit, or motor disruption.  20 C.F.R.
§§ 404.1529(c)(2), (4), 416.929(c)(2), (4).  Evidence of this
type is a useful indicator in making a reasonable conclusion
about the intensity and persistence of a claimant's symptoms and
the effect they may have on her ability to work.  Id.
Additionally, a claimant's treatment history and her ADL are
important indicators about the intensity and persistence of her
symptoms.  Id., at §§ 404.1529(c)(3)(I), (iv)-(vi), (4),
416.929(c)(3)(I), (iv)-(vi), (4).

The ALJ found Ms. Perry's statements regarding her
impairments and their impact on her ability to work were "not

entirely credible" (Tr. 23) given the objective evidence, her
treatment history, and her ADL (Tr. 23-24).  Dr. Seaman opined
there was no "objective evidence" to support an inference that
Ms. Perry was totally or permanently disabled from a
rheumatological standpoint (Tr. 246).  Dr. Seaman determined that
Ms. Perry had only "mild" osteoarthritis (Tr. 245, 379).  She had
no active synovitis (Tr. 254, 324, 382).  She exhibited good
range of motion of her cervical (Tr. 287, 333), thoracic
(Tr. 333) and lumbar (Tr. 252, 333) spines and shoulders
(Tr. 324) and joints (Tr. 382).  Her neurologic exams were
generally intact(Tr. 245, 252-54, 324, 333-34, 346, 360).  She
exhibited no atrophy (Tr. 252, 382).  She had no on-going motor
(Tr. 245, 252, 324, 333-34, 346, 382), sensory (Tr. 245, 252,
346), or reflex (Tr. 252-53, 324, 333, 346) deficits.  Her SLR
tests results were negative (Tr. 245, 253, 333).  She had no
paravertebral muscle spasms (Tr. 252).  Her peripheral pulses
were intact (Tr. 245) and her neurovascular status was intact
(Tr. 255, 324, 334, 382).  She did not have redness or warmth in
her joints (Tr. 380).  She had no knee effusion (Tr. 324).  Her
posture (Tr. 328) and gait (Tr. 287, 324, 328) were normal, and
she was well coordinated (Tr. 328, 333-34).

       As discussed, the ALJ found Ms. Perry's treatment
history and ADL were inconsistent with her allegation of "total
disability" (Tr. 23-24).  The ALJ considered (Tr. 23) Ms. Perry's
admission that her physician(s) had not placed any restrictions

upon her (Tr. 70).  The ALJ noted (Tr. 24) the medications that
Ms. Perry took were relatively effective in controlling her
symptoms (Tr. 82, 185, 288, 369) and that she had not required
narcotic medication for her discomfort (Tr. 145, 166, 182, 185,
189, 199).  Ms. Perry's medical records revealed that she did not
experience any significant side-effects from the medication she
took (Tr. 287).  Moreover, she did not require regular, on-going
treatment with an orthopedic or a neurologic specialist by the
time of her hearing (Tr. 42-43).  Outside of the birth of her two
children (Tr. 328), the only hospitalization and/or surgery she
required (Tr. 326, 328) was for her CTS (Tr. 210-11, 262-64).
She had never required inpatient hospitalization (Tr. 143-44,
165-66, 189, 200).  She sought ER treatment in February 2002 for
residuals relating to a common cold (Tr. 232-43), but had not,
otherwise, required ER treatment (Tr. 206-305, 319-56, 360-64,
366-72, 374-82).  She had not made any changes to her home to
accommodate her condition (Tr. 66, 177).  She did not need to
wear or use any device, such as a brace or a TENS unit, to
relieve her discomfort since she alleged she became unable to
work (Tr. 186, 247).  She did not need to use an assistive
device, like a cane, to walk (Tr. 186, 333).  Lastly, she never
required referral to a psychologist or psychiatrist to help her
cope with her discomfort (Tr. 186).

Considering those subjective complaints that were
credible, the ALJ determined that Ms. Perry retained the RFC to

27

engage in a wide-range of unskilled light work which: (1) allowed her to change positions between sitting and standing; (2) did not involve crouching, crawling or kneeling, entailed only occasional climbing, balancing and bending, and limited bending to the degree necessary to touch her knees; and (3) involved working this things with occasional interaction with supervisors and co-workers and no interaction with the public (Tr. 24).  This determination is supported by substantial evidence and requires a finding of not disabled.

Summary judgment is appropriate when there are no disputed material issues of fact, and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56; <u>Edelman v. Commissioner of Social Sec.</u>, 83 F.3d 68, 70 (3d Cir. 1996).  In the instant case, there are no material factual issues in dispute, and it appears that the ALJ's conclusion is supported by substantial evidence.  For this reason, it is recommended that Ms. Perry's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that the decision of the Commissioner be affirmed.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report.  Any party opposing the objections shall have seven (7) days from the date of service of the

28

objections to respond thereto.  Failure to timely file objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/  *Amy Reynolds Hay*
AMY REYNOLDS HAY
United States Magistrate Judge


Dated:   10 January, 2006.

cc:  Hon. David S. Cercone
     United States District Judge

     N. Leah Fink, Esq.
     KUNKEL & FINK
     1208 Allegheny Building
     429 Forbes Avenue
     Pittsburgh, PA 15219

     Lee J. Karl
     Assistant United States Attorney
     United States Attorney's Office
     700 Grant Street
     Suite 400
     Pittsburgh, PA 15219